## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

EVY B. ORELLANA,

      Plaintiff,

      v.

UNITED STATES OF AMERICA,
U.S. MARSHAL RYAN GODEC,
*in his individual capacity*, and
U.S. MARSHAL TRISTAN MARTIN,
*in his individual capacity*,

      Defendants.

Civil Action No. TDC-20-0845

### MEMORANDUM OPINION

Plaintiff Evy B. Orellana has filed a civil action against Defendants the United States of America and Deputy United States Marshals Ryan Godec and Tristan Martin in which she asserts federal constitutional claims under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and tort claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671–80 (2018), arising from a July 2018 incident in which Orellana was bitten by a United States Marshals Service canine during the arrest of her boyfriend. Defendants have filed a Motion to Dismiss or for Summary Judgment, which is now fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

### BACKGROUND

In June 2018, the District Court of Maryland for Prince George's County issued an arrest warrant for Eric Arturo Trinidad on charges of first-degree assault, second-degree assault, and

reckless endangerment arising out of allegations that Trinidad had engaged in domestic violence against Orellana, including by twice grabbing her by the hair and slamming her head to the floor, twice punching her in the head, and grabbing her by the throat and choking her. At that time, Trinidad and Orellana lived together with their infant on Beacon Light Road in Riverdale, Maryland in the basement of a townhouse owned by Yolanda Menendez, Trinidad's mother ("the Residence"). The portion of the basement in which Orellana, Trinidad, and their baby lived had a separate entrance from the exterior of the Residence, and it was separated from the rest of the basement by a door sealed with a spray-foam sealant. Menendez, her husband, Trinidad's sister Vanessa Menendez, and other relatives lived in the remainder of the Residence.

On July 3, 2018 at approximately 2:00 a.m., Deputy United States Marshal Ryan Godec ("Deputy Godec"), Deputy United States Marshal Tristan Martin ("Deputy Martin"), and 11 law enforcement officers from the Capital Area Regional Fugitive Task Force ("CARFTF"), which serves federal and state warrants issued to or adopted by the United States Marshals Service ("USMS"), arrived at the Residence to arrest Trinidad pursuant to the arrest warrant. Luis Rodriguez, a United States Immigration and Customs Enforcement agent and Special Deputy U.S. Marshal ("Deputy Rodriguez"), knocked on the door of the Residence, and Yolanda Menendez opened the door. Deputy Rodriguez told her that the CARFTF officers were there to arrest Trinidad and that everyone in the Residence needed to come outside. Yolanda Menendez stated that Trinidad "was not there," that she "didn't know," and that "he was working." Joint Record ("J.R.") 113, ECF No. 69. According to Yolanda Menendez, she gave these responses because Trinidad usually "worked in the evenings." *Id.*

CARFTF officers then entered the Residence and searched the main and upstairs floors without finding Trinidad. During the search, the CARFTF officers called out to Trinidad in both

2

English and Spanish. While doing so, a CARFTF officer, Larry Singleton, saw that Trinidad's name was appearing on his mother's cell phone sitting on a nightstand.

During the search, the CARFTF officers knocked on a second-floor bedroom door and woke up Vanessa Menendez, Trinidad's sister. At that time, Vanessa Menendez was receiving an incoming call on her cell phone from Trinidad. One officer asked Vanessa Menendez if Trinidad was downstairs in the basement, and she nodded her head in the affirmative. According to Vanessa Menendez, she also stated that "Evy, the baby, and Eric are downstairs." J.R. 123. Deputy Martin and Deputy Godec deny that anyone informed the CARFTF team that Orellana and her baby were in the basement.

Once the CARFTF officers had everyone from the main residence outside, Deputy Rodriguez asked them if Trinidad was in the basement. Most of them responded by saying no, but Deputy Rodriguez and Deputy Martin saw Vanessa Menendez nod her head in the affirmative. According to Deputy Rodriguez, "We had no indication that he was there with anybody else." J.R. 86.

At that point, according to Deputy Martin, CARFTF officers called out to Trinidad from the top of the interior stairs to the basement, but there was no response. The CARFTF officers discussed how to proceed and jointly decided to use a USMS canine trained to bite the first person encountered, out of concern that Trinidad could be waiting to ambush officers. Before the USMS deploy such a canine, the standard procedure is to first give three announcements that explain who the officers are, state what the officers are doing, and warn what will happen if the person sought does not safely surrender, including that the canine will find and bite the person. If officers give those announcements and the individual sought has not complied, the officers then release the

3

canine off its leash to search for and apprehend the person sought. At that point, the canine will bite the first person it sees.

First, the CARFTF officers went to the top of the interior stairs leading down to the basement. Deputy Godec has asserted that he called out a warning in which he stated, "Eric Trinidad, any other occupants, this is the police with K9, come out now or [we will] send a dog to find you and bite you." J.R. 208. According to Deputy Martin, he also called out the same warning three times from the top of the basement stairs, and Deputy Rodriguez gave the same warning in Spanish multiple times. Deputy Godec asserts that from the top of the stairs, he made three announcements in English and Deputy Rodriguez made three announcements in Spanish. Deputy Godec, the canine's handler, then twice released the canine off-leash into the basement from the top of the stairs, but the dog returned each time without finding Trinidad.

At that point, the CARFTF officers realized that the basement was divided into at least two sections and suspected that Trinidad was in the separate section of the basement. Several CARFTF officers, including Deputy Godec and Deputy Martin, went downstairs into the basement and saw the sealed door that led to the separate living space. Deputy Martin and others knocked on the door, announced that they were there and knew that Trinidad was inside, but received no response. The officers then used tools to pry open the door partially. Deputy Martin asserts that with the door partially open, the officers again called out to Trinidad, stating that they were the police and knew that he was inside and asking him to surrender.

According to Deputy Martin, Deputy Godec gave the same warning as before about the presence of the canine in English, and Deputy Rodriguez gave the same warning in Spanish. Deputy Godec has testified that the announcement was made but does not recall who made it. Deputy Rodriguez, however, states that after he gave the warning in Spanish at the top of the stairs

4

leading into the basement, he came back out of the Residence to talk to the family members outside, at which time he told them that they should confirm that Trinidad was in the basement unit and ask him to come out because the officers were going to send in a police dog and Trinidad would get bitten.

When no one responded to the warnings, Deputy Godec then released the canine through the partially open door into the basement living area. Based on its training to bite the first person encountered, the canine went to Orellana, bit her, and pulled her to the ground, in the course of which the dog took out a piece of flesh from her leg with his teeth. Upon hearing Orellana scream, the CARFTF officers entered the basement living area and saw the canine biting Orellana, as well as Trinidad hiding behind the bed. Deputy Godec took the canine "off the bite" and removed it from the room. Joint Statement of Undisputed Facts ¶ 35, ECF No. 61. CARFTF officers then gave Orellana medical aid and brought her outside to an ambulance.

At the same time, officers arrested Trinidad, who was not resisting at that point. Trinidad claims that during the arrest, one officer put his knee on his back and put his other knee near the right side of his face and was striking his face with his knee. J.R. 164. According to Trinidad, when he complained about that treatment, the officer called him a "little bitch." *Id.*

Both Orellana and Trinidad have stated that although they heard banging and footsteps upstairs while law enforcement was searching the rest of the Residence, they never heard voices or warnings before the canine entered their living area and bit Orellana. Trinidad asserts that no warnings were given because he would have heard any such warnings given from the basement. As a result of the dog bite, Orellana suffered deep lacerations on her left thigh, requiring more 40 stitches. She also sought psychiatric treatment.

5

On March 31, 2020, Orellana filed the present civil action. The presently operative Amended Complaint alleged the following causes of action. In Count 1, Orellana asserts claims against Deputy Godec and Deputy Martin that she was unlawfully seized and subjected to excessive force, in violation of her rights under the Fourth Amendment to the United States Constitution under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). In Counts 2 through 6, Orellana alleges tort claims against the United States under the FTCA in the following numbered courts: (2) battery; (3) false imprisonment; (4) negligence; (5) gross negligence; and (6) intentional infliction of emotional distress ("IIED"). On April 5, 2021, the Court (Chasanow, J.) granted in part and denied in part Defendants' Motion to Dismiss and dismissed the negligence and gross negligence claims in Counts 4 and 5 because sovereign immunity has not been waived for such claims. *Orellana v. United States*, No. 20-0845, 2021 WL 1251888, at *4, *7 (D. Md. Apr. 5, 2021) ("*Orellana I*").

## DISCUSSION

Following discovery, Defendants have now filed a second dispositive motion, a Motion to Dismiss or for Summary Judgment, in which they argue that: (1) Orellana's *Bivens* claim is foreclosed by recent United States Supreme Court precedent; (2) even if the *Bivens* claim is viable, Deputy Godec and Deputy Martin are entitled to qualified immunity; (3) Orellana has failed to demonstrate the "actual malice" necessary to sustain her FTCA claims, Mot. at 26, ECF No. 62-1; and (4) Orellana's FTCA claims otherwise fail on their merits.

### I.    Legal Standards

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the

6

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

## II.    *Bivens* Claim

At the outset, Defendants argue that the *Bivens* claim in Count 1 must be dismissed based on the United States Supreme Court's recent ruling in *Egbert v. Boule*, 142 S. Ct. 1793 (2022), because the claim arises in a new *Bivens* context and special factors counsel against extending *Bivens* to this context.

In *Bivens*, six agents of the Federal Bureau of Narcotics entered the plaintiff's apartment and arrested him, handcuffed him in front of his wife and children, threatened to arrest his entire

7

family, and searched his apartment. *Bivens*, 403 U.S. at 389. The agents then took the plaintiff to a courthouse "where he was interrogated, booked, and subjected to a visual strip search." *Id.* The plaintiff sued the agents, alleging that the warrantless arrest and search were improper and that they used unreasonable force in arresting him. *Id.* at 389. The Supreme Court held that the plaintiff had a cause of action under the Fourth Amendment for damages. *Id.* at 397. The Court expanded the scope of such implied causes of action for constitutional violations in two subsequent cases. In *Davis v. Passman*, 442 U.S. 228 (1979), the Supreme Court held that a former congressional staff member who asserted a sex discrimination claim under the Fifth Amendment had an implied cause of action for damages. *Id.* at 231, 248–49. In *Carlson v. Green*, 446 U.S. 14 (1980), the Supreme Court held that the estate of a federal prisoner who died in custody had an implied cause of action for damages under the Eighth Amendment based on alleged deliberate indifference to serious medical needs. *Id.* at 16 & n.1, 18–19, 25.

In *Egbert*, the owner of a hotel in Washington state immediately adjacent to the Canadian border asserted federal constitutional claims against a United States Border Patrol agent who lifted the hotel owner off the ground, threw him against a vehicle, and threw him to the ground, then allegedly retaliated against him by reporting his license plate "SMUGLER" for referencing illegal conduct and by contacting the Internal Revenue Service and prompting an audit of the hotel owner's tax returns. *Egbert*, 142 S. Ct. at 1801–02. The plaintiff asserted claims under *Bivens* for excessive force under the Fourth Amendment and retaliation under the First Amendment. *Id.* at 1802. In declining to permit these *Bivens* claims to proceed, the Supreme Court noted that it has frequently declined to extend *Bivens* to other alleged constitutional violations and now views "[r]ecognizing a cause of action under *Bivens*" to be "a disfavored judicial activity" because of its view that Congress, not the courts, should establish causes of actions for damages arising under

the Constitution. *Egbert*, 142 S. Ct. at 1802–03 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017)). The Court stated that "[i]f there is a rational reason to think" that Congress and not the courts should "decide whether to provide for a damages remedy," then "no *Bivens* action may lie." *Id.* at 1803 (citations omitted). The Court then described its two-step inquiry for whether a *Bivens* claim may proceed. *Id.* First, a court asks whether the case presents "a new *Bivens* context" in that it is "meaningful[ly]' different from the three cases in which the Court has implied a damages action." *Id.* at 1803 (quoting *Ziglar*, 582 U.S. at 139). Among the potential differences to be considered are:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Ziglar v. Abbasi*, 582 U.S. 120, 139–40 (2017). A new context can also arise in a case involving a "new category of defendants." *Egbert*, 142 S. Ct. at 1803. Second, "if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* (quoting *Ziglar*, 582 U.S. at 136). Such special factors can include whether there is uncertainty over the "systemwide consequences of recognizing a cause of action under Bivens" and whether "Congress has already provided, or authorized the Executive [Branch] to provide, 'an alternative remedial structure," either of which alone could foreclose relief. *Id.* at 1804. The Court further observed that "those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* at 1803.

Under these principles, the Court held that the Fourth Amendment claim failed because while *Bivens* had recognized a Fourth Amendment excessive force cause of action, the Court of Appeals had already "conceded" that the plaintiff's claim "presented a new context for *Bivens* purposes," *id.* at 1804, and there were special factors weighing against recognizing a new cause of action, specifically, (1) that the claim was brought against a Border Patrol agent and occurred at or near the international border, and "Congress is better positioned to create remedies in the border-security context"; and (2) the Government had "already provided alternative remedies that protect plaintiffs" consisting of a statutory requirement that the Border Patrol control, direct, and supervise all employees, as well as regulations that the Border Patrol investigate alleged violations of the standards for enforcement activities and accept grievances from anyone who wishes to lodge a complaint. *Id.* at 1804, 1806–07. It also held that the First Amendment retaliation claim failed because that claim plainly sought to extend *Bivens* to the new context of First Amendment claims. *Id.* at 1807.  ⃰

### A.   New Context

Defendants argue that based on the principles set forth in *Egbert*, the Court should find that Orellana's constitutional claim arises in a new *Bivens* context because: (1) *Bivens* involved a warrantless search, while here Defendants had a warrant for Trinidad's arrest; (2) Orellana's injuries from the dog bite differed from the injuries in *Bivens*, in which the plaintiff was handcuffed in front of his family, agents threatened to arrest his family, and he was detained and subjected to a visual strip search, *Bivens*, 403 U.S. at 389; (3) the defendants in this case are Deputy United States Marshals rather than members of the Federal Bureau of Narcotics, as in *Bivens*; and (4) this case presents unique questions involving the application of the Fourth Amendment to the deployment of police dogs.

10

As to the argument that this case presents a new *Bivens* context because it involved a warrant, Defendants rely primarily on *Annappareddy v. Pascale*, 996 F.3d 120 (4th Cir. 2021), which states that "[w]hat *Bivens* involved was the Fourth Amendment right to be free of unreasonable *warrantless* searches and seizures; this case, by contrast, involves searches and seizures conducted *with* a warrant," and that as a result the "right at issue" was "meaningfully different from the one at issue in *Bivens* itself." *Id.* at 135. In *Annappareddy*, however, there was no claim of excessive force in the execution of a search or arrest warrant; rather the claim against federal investigators was for knowingly submitting false information to secure search warrants and for using similar false evidence to secure an indictment and an arrest warrant against the plaintiff. *Id.* at 130. Thus, the presence of warrants in *Annappareddy* was relevant to establish a new *Bivens* context because the plaintiff was challenging the issuance of those warrants based on the "'information-gathering and case-building activities' that represent[ed] 'a different part of police work than the apprehension, detention, and physical searches at issue in *Bivens*.'" *Id.* at 136 (quoting *Farah v. Weyker*, 926 F.3d 492, 498 (8th Cir. 2019)). Indeed, the court distinguished a Supreme Court case in which the Court had considered a *Bivens* claim involving a search warrant in part based on the fact that the claim did not require any "inquiry into probable cause." *Id.* at 136 n.9.

Here, unlike in *Annappareddy*, Orellana's *Bivens* claims do not challenge the means by which information was gathered for the warrant or the validity of the warrant, do not require any application of the probable cause standard, and do not even allege a violation based on the taking of actions that exceeded the scope of the warrant. Instead, the existence of the warrant is largely incidental to the claim, which "seeks to hold accountable line-level agents of a federal criminal law enforcement agency, for violations of the Fourth Amendment" involving excessive force

11

which, as in *Bivens*, was "committed in the course of a routine law-enforcement action." *Hicks v. Ferreyra*, 965 F.3d 302, 306, 311 (4th Cir. 2020). Indeed, courts have found viable *Bivens* claims within the context of the original *Bivens* Fourth Amendment claim based on alleged excessive force in the precise context at issue here—during an entry into a residence to execute an arrest warrant. For example, in *Jacobs v. Alam*, 915 F.3d 1028 (6th Cir. 2019), the court found that a *Bivens* claim did not arise in a new context when it was based on a U.S. Marshals Service search of a home for a fugitive and the firing of shots at the plaintiff, and it was instead a "run-of-the-mill" challenge to "standard law enforcement operations that fall well within *Bivens* itself." *Id* at 1033–34, 1038–39. *See also Ting v. United States*, 927 F.2d 1504, 1513 (9th Cir. 1991) (finding a viable *Bivens* claim for excessive force arising from the shooting of the plaintiff during an entry to his house to execute an arrest warrant). Thus, while the presence of a warrant can establish a new context under certain circumstances, it does not do so here.

Next, the Court does not find that the articulated factual differences from *Bivens* itself, such as the federal law enforcement agency for which Defendants work, or the specific conduct and injuries at issue, establish a new *Bivens* context. Although *Bivens* involved a claim against agents of the Federal Bureau of Narcotics for improperly handcuffing, detaining, and strip searching the plaintiff, *Bivens*, 403 U.S. at 389, the United States Court of Appeals for the Fourth Circuit has found *Bivens* applicable to Fourth Amendment excessive force claims involving different agencies and different forms of alleged misconduct. *See Hicks v. Ferreyra*, 965 F.3d 302, 306, 311 (4th Cir. 2020) (although declining to consider the claim that there was a new *Bivens* context because that argument was not preserved for appeal, stating that case was effectively a "replay" of *Bivens* even though the defendants were United States Park Police Officers and the misconduct involved twice conducting traffic stops of the plaintiff, a United States Secret Service special agent, without

12

probable cause or reasonable suspicion); *cf. Schultz v. Braga*, 455 F.3d 470, 472-73, 479 (4th Cir. 2006) (permitting a *Bivens* excessive force claim to proceed where the defendant was a special agent of the Federal Bureau of Investigation and the alleged misconduct was shooting the plaintiff during an operation to arrest him out of his vehicle).

Although the *Egbert* Court highlighted the fact that the defendant was a Border Patrol agent, it did so as part of its conclusion that the case presented issues relating to border security that set it apart from the typical Fourth Amendment excessive force claims permitted by *Bivens*. *Egbert* specifically referenced *Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020), another case in which the Court declined to extend *Bivens* to apply to a claim against a Border Patrol agent with national security and border security implications. *Egbert*, 142 S. Ct. at 1804–05 (emphasizing that the Border Patrol agent was investigating illegal entries by individuals and goods near the United States-Canada international border and thus engaged in matters implicating foreign policy and national security); *Hernandez*, 140 S. Ct. at 739, 747 (declining to extend *Bivens* to a case involving a shooting across the United States-Mexico international border because the circumstances of the case implicated foreign relations and national security, areas into which judicial inquiry would raise specific separation of powers concerns). Indeed, to the extent that Defendants argue that separation-of-powers concerns could cause Orellana's claim to present a new *Bivens* context such that "Congress might be better equipped to create a damages remedy," *Egbert*, 142 S. Ct. at 1803. (quoting *Ziglar*, 582 U.S. at 140), the instances in which the Supreme Court has invoked such concerns have typically involved specific considerations that clearly implicated the prerogatives of another branch of government. *See, e.g.*, *Hernandez*, 140 S. Ct. at 739, 747; *Ziglar*, 582 U.S. at 140-41 (declining to extend *Bivens* to a new context where the plaintiffs challenged conditions of confinement imposed on undocumented immigrants "pursuant

13

to a high-level executive policy created in the wake of a major terrorist attack on American soil"
for which a *Bivens* claim "would require courts to interfere in an intrusive way with sensitive
functions of the Executive Branch"). Challenges to high-level executive branch decisions and
foreign relations and national security issues are not present here. Rather, the mission of the U.S.
Marshals Service in executing arrest warrants does not implicate such specialized interests in a
way that sets Orellana's claim apart from those involving standard federal law enforcement
activities by other federal agencies such as the drug investigation at issue in *Bivens.*

Finally, although Defendants argue that this case presents unique questions involving the
application of the Fourth Amendment to the deployment of police canines, they do not explain
how these specific facts establish that this case "is different in a meaningful way" warranting a
finding of a new *Bivens* context, other than their claim, which the Court finds to be incorrect under
controlling authority, that the dog's biting of Orellana did not constitute a seizure under the Fourth
Amendment. *Ziglar*, 582 U.S. at 139; *see infra* part III.B. Though Defendants argue that law
enforcement officers have less control over police dogs once released than they have over the law
enforcement conduct in encounters such as the physical arrest, detention, and search in *Bivens*
itself, *Bivens* excessive force claims have been permitted even when the law enforcement officers
took actions for which they did not have complete control over the result, such as the firing of a
shot. *See Schultz*, 455 F.3d at 472-73, 479; *Jacobs* 915 F.3d at 1033–34, 1038–39; *Ting*, 927 F.2d
1504 at 1513.

Ultimately, while the Supreme Court and the Fourth Circuit have found that certain factual
differences can result in a new *Bivens* context, those cases involve more distinctly different
contexts. *See, e.g.*, *Egbert*, 142 S. Ct. at 1806 (emphasizing border security and national security
issues); *Ziglar*, 582 U.S. at 140-41 (finding that a *Bivens* claim based on confinement conditions

14

imposed on undocumented immigrants pursuant to a "high-level executive policy created in the wake of a major terrorist attack on American soil" implicated national security, separation of powers, and terrorism issues and thus involved a new *Bivens* context); *Tate v. Harmon*, 54 F.4th 839, 845–46 (4th Cir. 2022) (finding that a prisoner's Eighth Amendment conditions-of-confinement claim involved a new *Bivens* context different from that of the Eighth Amendment inadequate medical care claim in *Carlson*); *Dyer v. Smith*, 56 F.4th 271, 275-76, 278 (4th Cir. 2022) (finding that First and Fourth Amendment *Bivens* claims arose in a new context when they derived from an airport search by the Transportation Security Administration, which has different legal authorities from traditional law enforcement agencies, and included an effort by the plaintiff to record the encounter); *Annappareddy*, 996 F.3d at 136 (finding a new *Bivens* context arising from a Fourth Amendment challenge to the validity of a warrant based on the fact-gathering process leading to a warrant, which was "never contemplated" by *Bivens*).    Under the considerations set forth in *Ziglar*, the present case is similar to *Bivens* itself in that it involves officers of similar rank, the same constitutional right, the same specificity of action in that it relates to a discrete encounter with a citizen, and no articulable risk of disruptive intrusion on the functioning of other branches of government. *Ziglar,* 582 U.S. at 140. Though the presence of an arrest warrant arguably establishes some difference in the "extent of judicial guidance" on how to respond to the problem and in the legal mandate under which the officer was operating, where the issue here was not the basis or scope of the warrant, but the permissible conduct in effectuating an arrest, such differences are not meaningful for purposes of the analysis. *See id.* at 140. Thus, the Court finds that the present *Bivens* claim involves the same right at issue in *Bivens*—freedom from excessive force under the Fourth Amendment—and does not involve a new *Bivens* context. *See Bivens*, 403 U.S. at 389; *Schultz*, 455 F.3d at 479; *Jacobs* 915 F.3d at 1033–34, 1038–39.

15

**B.     Special Factors**

Because Orellana's *Bivens* claim does not present a new *Bivens* context, it is unnecessary

to proceed to the "special factors" second step of the inquiry. *See Egbert*, 142 S. Ct. at 1803.  In

*Dyer*, the Fourth Circuit, in applying *Egbert*, specifically stated that "[i]f the context is *not* new . .

. then a *Bivens* remedy continues to be available." *Dyer*, 56 F.4th at 277 (stating that "if the claim

arises in a new *Bivens* context," the court "must next evaluate whether there are special factors

counselling hesitation in expanding *Bivens*").  Defendants, in fact, acknowledge that the special

factors inquiry is conducted to identify a basis to avoid "extending *Bivens* to [a] new context."

Mot. Dismiss at 17, ECF No. 62-1.  Thus, the Court need not and does not address Orellana's

arguments relating to special factors.

Because the Court finds that Orellana's Fourth Amendment excessive force claim does not

present a new *Bivens* context, the Motion to Dismiss will therefore be denied as to the argument

that the claim in Count 1 constitutes an improper extension of *Bivens*.

**III.    Qualified Immunity**

Defendants also argue that Deputy Godec and Deputy Martin are entitled to qualified

immunity because (1) they intended to seize Trinidad, not Orellana, and therefore could not have

seized Orellana under the Fourth Amendment; and (2) their actions did not violate a clearly

established constitutional right.

Government officials sued in their individual capacities may invoke the protection of

qualified immunity to bar a claim for civil damages. *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982); *Henry v. Purnell*, 501 F.3d 374, 376–77 (4th Cir. 2007). When qualified immunity is

asserted, a court must consider two questions:  (1) whether the facts, viewed in the light most

favorable to the plaintiff, show that the official violated a constitutional right; and (2) "whether the

right was clearly established," that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001); *Henry*, 501 F.3d at 377. For qualified immunity to apply, only one of the questions has to be resolved in favor of the defendant. *See Henry*, 501 F.3d at 377. Courts may address the questions in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Notably, "qualified immunity does not 'override the ordinary rules applicable to summary judgment proceedings.'" *Schultz v. Braga*, 455 F.3d 470, 476 (quoting *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005)). As a result, "a genuine question of material fact regarding whether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial." *Id.* (quoting *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005)).

### A.    Seizure

In invoking qualified immunity, Defendants primarily argue that the evidence does not establish that the biting of Orellana constituted a seizure under the Fourth Amendment because she was not the intended target of the CARFTF officers when they released the canine into the basement living area. This argument fails based on controlling precedent that establishes that when a police dog is released off-leash to apprehend a suspect, the apprehension of a different person still constitutes a seizure under the Fourth Amendment. In *Vathekan v. Prince George's County*, 154 F.3d 173 (4th Cir. 1998), the plaintiff, Esther Vathekan, owned a house and rented out the basement to two tenants. *Id.* at 175–76. One day, one of the tenants noticed that someone had broken into the basement unit, so he called the police. *Id.* at 176. When the responding police officer asked if anyone else should rightfully be in the house, the tenant said, "there shouldn't be." *Id.* The officer then called for a canine unit, and the canine officer released the dog into the basement unit. *Id.* The dog then went up the stairs to the door to the main house and detected a

17

human presence behind the door. *Id.* Without announcing the presence of the dog or giving any warning, the officer then opened the door to the main house and released the dog, which then went to Vathekan, who was sleeping, and bit her in the head and face. *Id.* at 176–77. The district court held that because Vathekan was an innocent bystander, she had not stated a valid claim that her Fourth Amendment right to be free from excessive force during a seizure had been violated because the intended object of the released dog was a burglar, not Vathekan. *Id.* at 177–78. The Fourth Circuit, however, reversed and held that Vathekan had been subjected to a Fourth Amendment seizure, which "occurs whenever 'there is a governmental termination of freedom of movement *through means intentionally applied.*'" *Id.* at 178 (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989)). The Fourth Circuit reasoned that because the officer knew that someone was behind the door, thought the person was a burglar, and released the dog with the intent "that the dog find and bite that person," the seizure of Vathekan was "therefore purposeful, even if [the officer] would not have seized her had he known she was innocent," and thus constituted a seizure under the Fourth Amendment. *Id.*

The present case is strikingly similar. Here, Deputy Godec released the canine into the basement unit with the belief that Trinidad was there and specifically intended for the dog to find and bite the first person encountered, but that person ended up being Orellana instead. Under *Vathekan*, the Court must reject Defendants' argument that there was no Fourth Amendment violation because the biting of Orellana did not constitute a seizure.

The cases cited by Defendants are distinguishable. In *Maney v. Garrison*, 681 F. App'x 210 (4th Cir. 2017), an unpublished case, after a police officer and his police canine tracked a robbery suspect to an apparently abandoned house, the dog, while still on leash, suddenly "sprang into action, biting an individual crouched behind a nearby bush," who proved to be an innocent

18

homeless person. *Id.* at 212. The court held that there was no seizure under the Fourth Amendment and specifically distinguished *Vathekan* on the grounds that while in that case the officer released the dog from its leash with the intent that it seize a person, the officer in *Maney* still had the dog on a leash to exercise control over its movements, had not directed the dog to seize anyone or intended for it to do so, and did not expect the dog to lunge into the bushes. *Id.* at 216, 219.

In *Rucker v. Harford County*, 946 F.2d 278 (4th Cir. 1991), which predates *Vathekan*, police officers responded to a report about someone driving recklessly, and when the driver drove into a cornfield, the officers surrounded the area. *Id.* at 280. When an officer confronted the driver, the driver accelerated, and officers shot at the driver's tires as he tried to escape. *Id.* One shot hit the plaintiff, another motorist who had previously been told to leave the area but had apparently come back to the area on foot without the police's knowledge and was lying on an embankment in the vicinity of the shooting when it occurred. *Id.* The court held that the plaintiff was not seized within the meaning of the Fourth Amendment because he was not "the intended object of the specific act of physical restraint," which was the vehicle to be stopped by shooting its tires. *Id.* at 281. Here, in contrast, as in *Vathekan*, the intended object of the specific act of physical restraint was the first person encountered by the dog sent into the basement living area, which proved to be Orellana.

Thus, under *Vathekan*, the Court finds that because the CARFTF officers specifically intended to seize a person when they released the canine, Orellana was subjected to a seizure under the Fourth Amendment, even though she was not the specific person they sought. *Vathekan*, 154 F.3d at 178.

19

### B.     Excessive Force

As for whether the record provides sufficient evidence to establish that Defendants' use of the canine to seize Orellana violated a constitutional right, controlling precedent establishes that the Fourth Amendment would be violated if the CARFTF officers failed to give a warning that they would release the dog before they did so. In *Vathekan*, the court reversed a grant of summary judgment on qualified immunity grounds even though the officer asserted that he had given a "very loud" warning before releasing the dog into the house, and other officers stated that they heard the warning, because both Vathekan, who was inside the house, and the tenant, who was standing outside the house, stated that they did not hear any such warning. *Id.* at 180. The court found that there was a genuine issue of material fact on the question of whether the warning was given, because in its absence the use of the police canine would have violated the Fourth Amendment. *Id.*

Here, there is a similar factual dispute over whether warnings were given. Deputy Martin has testified in his deposition that he specifically gave multiple warnings that the officers had a police canine, would release it, and Trinidad would be bitten if he did not surrender. Deputy Rodriguez has testified that he gave the same warnings in Spanish. Deputy Martin and Deputy Godec both state that the warnings were also given once the door to the basement living area was breached. Orellana and Trinidad, in contrast, have stated in their depositions that although they heard footsteps and banging from upstairs, they never heard any verbal warnings from the CARFTF officers, whether about their presence generally or the specific intention to release a dog that would bite the first person encountered. Trinidad has further stated that he would have heard any such warnings if they were given after the sealed basement door was breached.

20

In *Vathekan*, the court denied summary judgment even though the plaintiffs' witnesses could state only that they did not hear any warnings, not that they could confirm that no warning was given, because "[a] juror could reasonably conclude that if certain witnesses did not hear a warning, then *no* warning was given, even if other witnesses testify to a warning." *Vathekan*, 154 F.3d at 180. Thus, regardless of the number of witnesses who testified that warnings were given, or the number of warnings that they assert were given, the Court must conclude that there is a genuine issue of material fact on the issue of whether warnings were given that is sufficient to preclude summary judgment on qualified immunity grounds. *See Vathekan*, 154 F.3d at 180.

There is another material factual dispute over whether the CARFTF officers were aware that Orellana and the baby were with Trinidad in the basement. Although Deputy Martin and Deputy Rodriguez have testified that Vanessa Menendez nodded her head to acknowledge that Trinidad was in the basement, they and Deputy Godec deny that she or anyone else ever told the CARFTF officers that Orellana and the baby were with him. Deputy Rodriguez states that if they had been told "that there were other people down there, including a newborn, we wouldn't have released the dog." J.R. 84. Deputy Godec states that if he had known that Orellana and her baby were downstairs, he "would not have released the dog." J.R. 209. In contrast however, Vanessa Menendez has testified in her deposition that when she was woken up and asked by an officer if Trinidad was "downstairs," she nodded her head and also stated that Trinidad was downstairs with Orellana and their baby. J.R. 122. Thus, although the officers have strenuously asserted that their course of conduct would have been different had they known that Orellana and the baby were present, in doing so, they implicitly recognize that the reasonableness of their actions would be undermined if, in fact, they had been told that another person and a baby were present in the area in which they sent a police canine trained to bite the first person encountered. Thus, there is also

a genuine issue of material fact on whether the CARFTF officers were aware that Orellana and the baby were in the basement living area with Trinidad. At this stage, the Court cannot engage in credibility determinations, which are the province of the jury. Thus, the Court finds that there are genuine issues of material fact on whether Defendants violated the Fourth Amendment.

### C.    Clearly Established Right

As for whether the right at issue was clearly established at the time of this incident, in considering whether a right is "clearly established," the Court considers whether "the contours of the right are sufficiently clear that a reasonable officer would understand that what he is doing violates that right" and was thus "on notice" that the conduct violated established law. *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018) (quoting *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013)). Even if no court has found that the specific conduct in question violated an individual's rights, "if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question," the right may be clearly established. *Id.* (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017)). However, "courts must not 'define clearly established law at a high level of generality.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)); *see White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam). A court must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White*, 580 U.S. at 79; *Safar v. Tingle*, 859 F.3d 241, 246 (4th Cir. 2017). Although the facts of such a case need not be "identical" to the present facts, *Safar*, 859 F.3d at 248, it should be "obvious" that the case applies to the facts, *White*, 580 U.S. at 80.

In assessing this question, a court "first examine[s] 'cases of controlling authority in [this] jurisdiction,'" here, the Supreme Court, the Fourth Circuit, and the Maryland Supreme Court.

22

*Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (quoting *Amaechi v. West*, 237 F.3d 356, 363 (4th Cir. 2001)).  If that authority is not dispositive, the Court may still consider "'a consensus of cases of persuasive authority' from other jurisdictions" as a basis to find that conduct was barred by clearly established law.  *Id.* at 539 (quoting *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 280 (4th Cir. 2004)).  When considering whether there is such a "consensus," a court considers not only the broad holdings of those cases but also the specific requirements adopted by each court.  *See Owens ex rel. Owens v. Lott*, 372 F.3d 267, 280 (4th Cir. 2004).

Here, under *Vathekan*, "Fourth Circuit precedent existing in 1995 clearly established that failure to give a warning before releasing a police dog" to seize someone "is objectively unreasonable in an excessive force context" and a "violation of the Fourth Amendment." *Vathekan*, 154 F.3d at 179.  Because *Vathekan* is controlling authority and involves comparable facts, the Court finds that there was clearly established law predating the events in question that demonstrated that the release of a police canine to apprehend a suspect without first giving a warning violates the Fourth Amendment.  *Dolgos*, 884 F.3d at 185.

Where there are genuine issues of material fact whether Defendants violated Orellana's Fourth Amendment right to be free from excessive force arising from a bite by a police canine released without warning, and that right was clearly established at the time of this incident, the Court must deny summary judgment on the issue of qualified immunity.

## IV.    FTCA

Finally, Defendants argue that they are entitled to summary judgment on Orellana's FTCA claims because:   (1) Defendants did not act with actual malice;  (2) the battery and false imprisonment claims fail because Defendants' actions were legally justified; and (3) Defendants' conduct was not extreme or outrageous as required to establish a claim for IIED.

23

The United States and its officers are immune from suit unless they have expressly waived sovereign immunity. *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994). The FTCA provides a limited waiver of sovereign immunity to permit a suit for damages against the United States, but not federal officers in their individual capacities, for "personal injury . . . caused by the negligent or wrongful act or omission or any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §§ 1346(b)(1), 2674. Such claims may include claims for assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution by federal law enforcement officers. 28 U.S.C. § 2680(h). In this instance, Orellana's FTCA claims are governed by the law of Maryland, the state in which the alleged tortious acts occurred. 28 U.S.C. §§ 1346(b). Under Maryland law, law enforcement officers are immune from tort liability for acts or omissions committed within the scope of their employment unless committed with malice or gross negligence. Md. Code Ann., Cts. & Jud. Proc. § 5–522(b) (LexisNexis 2020).

### A.    Malice or Gross Negligence

Under Maryland law, malice is defined as "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." *Lee v. Cline*, 863 A.2d 297, 311 (Md. 2004) (internal citations omitted). Gross negligence, on the other hand, is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another," and "also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007) (quoting *Liscombe v. Potomac Edison Co.*, 495 A.2d 838, 846 (Md. 1985)). Gross negligence is established only if the defendant "inflicts injury intentionally or is so utterly indifferent to the

24

rights of others that he acts as if such rights do not exist." *Id.* (quoting *Liscombe v. Potomac Edison Co.*, 495 A.2d 838, 846 (Md. 1985)).

Even viewing the evidence in the light most favorable to Orellana, as is required at this stage, the Court finds little to no evidence of actual malice. Defendants were charged with executing an arrest warrant on an individual charged with a crime that they did not personally investigate. There is no evidence that Defendants had any prior contact with Trinidad. It is also undisputed that upon arriving at the Residence, Defendants did not immediately seek to use the canine and instead first knocked on the front door, arranged for the occupants of the main residence to leave the premises, and searched the main house, all without the use of the canine. Even if, as asserted by Vanessa Menendez, they were told that Orellana and her baby were in the basement unit with Trinidad, there is no evidence as to why they would intentionally seek to injure Orellana, who was understood to be the victim of Trinidad's crime. Although Trinidad claims that while he was being arrested, one of the CARFTF officers used his knee against his face and then used profanity when he complained, this case involves no claim of excessive force against Trinidad, and these facts, if true, would still provide only limited evidence of an "evil or wrongful motive" or "ill-will" at the time that the canine was released. *Lee*, 863 A.2d at 311.

Nevertheless, regardless of whether there is sufficient evidence to establish malice, there is sufficient evidence to support a finding of gross negligence if all material factual disputes are resolved in Orellana's favor. As discussed above, the two specific genuine disputes of material fact are whether Defendants were told that Orellana and her baby were with Trinidad in the basement unit and whether they gave verbal warnings that they would release the canine and that it would bite the first person it encountered, before actually releasing the canine into the basement unit. *See supra* part III.B. If both factual disputes are resolved in Orellana's favor, a reasonable

25

jury could conclude that Defendants, in releasing the canine into a space with knowledge that an innocent victim and an infant were present, with the knowledge that the canine was trained to bite the first person encountered, and without giving any verbal warnings about the imminent use of such a police canine, "acted with thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007) (quoting *Liscombe*, 495 A.2d at 846). While the Court recognizes that Defendants and other CARFTF officers have disputed these facts in their depositions, on summary judgment the Court must draw all inferences in favor of the nonmoving party and must leave all credibility determinations to the jury. Thus, it cannot grant summary judgment on the FTCA claims based on the alleged lack of evidence of gross negligence.

### B.   Battery

Defendants seek summary judgment on the battery claim based on their claim that their actions were legally justified. Under Maryland law, battery is the "unlawful application of force to the person of another. " *Snowden v. State*, 583 A.2d 1056, 1059 (Md. 1991). A law enforcement officer is not liable for battery for using a reasonable amount of force when effectuating a lawful detention or arrest. *See Ashton v. Brown*, 660 A.2d 447, 471 n.24 (Md. 1995); *Busch v. State*, 426 A.2d 954, 958 (Md. 1981); *Hines v. French*, 852 A.2d 1047, 1055–56 (Md. Ct. Spec. App. 2004) (holding that officers were entitled to judgment as a matter of law on claims of battery, false imprisonment, and false arrest where they had legal justification to arrest the plaintiff). However, if during a valid arrest "an officer uses excessive force, or force greater than is reasonably necessary under the circumstances, the officer may be liable" for battery. *French v. Hines*, 957 A.2d 1000, 1037 (Md. Ct. Spec. App. 2008).

26

Although Orellana is correct that the arrest warrant did not authorize Defendants to arrest or detain her, Defendants are correct that there are circumstances under which law enforcement officers may physically touch and temporarily detain individuals in the vicinity of the execution of a valid arrest. *See Cotton v. State*, 872 A.2d 87, 92–93 (Md. 2005). Regardless, however, where there are genuine disputes of material fact relating to whether Deputy Godec and Deputy Martin used excessive force against Orellana in violation of the Fourth Amendment right by releasing a police canine without warning, *see supra* part III.B, and the use of excessive force during otherwise lawful law enforcement activity can establish a battery, the Court must deny the Motion as to the battery claim.

### C.    False Imprisonment

Defendants seek summary judgment on the false imprisonment claim on the grounds that they were legally justified in detaining Orellana as part of the effort to arrest Trinidad pursuant to the warrant. Under Maryland law, to establish a false arrest or false imprisonment, a plaintiff must show (1) "the deprivation of the liberty of another"; (2) "without consent"; and (3) "without legal justification." *Heron v. Strader*, 761 A.2d 56, 59 (Md. 2000). "[W]here the basis of a false imprisonment action is an arrest by a police officer, the liability of the police officer for false imprisonment will ordinarily depend on whether or not the officer acted within his legal authority to arrest." *Montgomery Ward v. Wilson*, 664 A.2d 916, 926 (Md. 1995). Under certain circumstances, law enforcement officers may detain individuals during the execution of a warrant for safety purposes. *See Michigan v. Summers*, 452 U.S. 692, 705 (1981) (permitting the temporary detention of occupants of the premises during the execution of a search warrant); *Cotton*, 872 A.2d at 92–93.

27

Here, Orellana questions Defendants' legal authority to execute the arrest warrant for Trinidad because they were acting as part of a "fugitive task force" but Trinidad arguably was not a "fugitive." Opp'n at 9–10, ECF No. 65. However, "United States marshals [and] deputy marshals . . . in executing the laws of the United States within a State, may exercise the same powers which a sheriff of the State may exercise in executing the laws thereof." 28 U.S.C. § 564. Because working on a task force such as CARFTF is part of the work of the USMS under federal law, *see* 34 U.S.C. § 41503 (2018), and it is undisputed that the sheriff could execute the arrest warrant for Trinidad, Defendants were authorized to do so as well.

As with the battery claim, the Court rejects the argument that just because Defendants had the legal authority to arrest Trinidad pursuant to the warrant, they also had the authority to arrest Orellana, but it recognizes that some brief detention of others at the scene was legally permissible in order to secure Trinidad, particularly where the CARFTF officers were informed that Trinidad was in the basement but did not voluntarily surrender, raising potential safety concerns. *See Summers*, 452 U.S. 705; *Cotton*, 872 A.2d at 92–93. It is undisputed that Orellana was not actually placed under arrest and that she was physically seized for only a very brief time before she was released to go to the hospital for medical attention. Although the amount of force used in conducting the seizure—being bitten and held by a police dog—was troubling and arguably constituted excessive force, it is that use of force, rather than the fact and duration of the detention, that constituted the arguably unjustified harm at issue. Those issues are more properly addressed through the battery claim, for which excessive force during law enforcement action is a recognized form of the tort. *French*, 957 A.2d at 1037. Where the evidence establishes that the CARFTF officers had the authority to briefly detain Orellana during their execution of the arrest warrant against Trinidad, and the duration of the detention was of very limited duration so as not to exceed

28

that authority, the Court finds that there is no viable false imprisonment claim. *See Summers*, 452 U.S. 705; *Cotton*, 872 A.2d at 92–93.  The Motion will be granted as to Orellana's false imprisonment claim under the FTCA.

### D.    IIED

To establish an IIED claim under Maryland law, a plaintiff must show:  (1) intentional or reckless conduct; (2) that the conduct was extreme and outrageous; (3) that the plaintiff suffered severe emotional distress; and (4) that there was a causal connection between the conduct and the emotional distress. *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977).  In their Motion, Defendants argue only that their conduct was not extreme and outrageous.  A defendant is liable for IIED only if the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 614 (quoting Restatement (Second) of Torts § 46 cmt. d (American Law Inst. 1965)).  Under this standard, Maryland courts have limited "extreme and outrageous" conduct to only the most egregious conduct aimed at causing emotional pain and trauma. *See, e.g.*, *Young v. Hartford Accident & Indem. Co.*, 492 A.2d 1270, 1285 (Md. 1985) (holding that where the plaintiff's worker's compensation insurer insisted that she submit to a psychiatric evaluation for the "sole purpose" of harassing her and forcing her to drop her claim or commit suicide, such conduct was sufficiently extreme and outrageous for purposes of IIED); *B.N. v. K.K.*, 538 A.2d 1175, 1181 (Md. 1988) (sustaining an IIED claim when a physician with herpes had sex with a nurse without informing her that he had the disease and infected her); *Figueiredo-Torres v. Nickel*, 584 A.2d 69, 77 (Md. 1991) (finding that the claim that a psychologist engaged in sexual relations with the plaintiff's wife while he was counseling the couple involved extreme and outrageous conduct). *Reagan v. Rider*, 521 A.2d 1246, 1247, 1251 (Md. Ct. Spec. App. 1987) (affirming a

jury verdict of IIED against the plaintiff's stepfather who had engaged in sexual abuse of the plaintiff during six years of her childhood).

As discussed above, the Court finds little to no evidence of actual malice by the CARFTF officers. *See supra* part IV.A. Under these circumstances, and where there is no dispute that the CARFTF officers released the canine as part of a valid law enforcement action to execute an arrest warrant for Trinidad, and there is no evidence that they were specifically targeting Orellana or seeking to cause her emotional harm, the Court finds that the conduct did not reach the requisite standard. Thus, the Court will grant the Motion as to the IIED claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or for Summary Judgment will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to the false imprisonment claim in Count 5 and the IIED claim in Count 6 and will be otherwise denied. A separate Order shall issue.

Date:   September 25, 2023

THEODORE D. CHUANG
United States District Judge

30